Roger N. Behle, Jr., State Bar No. 174755
rbehle@foleybezek.com
Marisa D. Poulos, State Bar No. 197904
mpoulos@foleybezek.com
**FOLEY BEZEK BEHLE & CURTIS, LLP**
575 Anton Boulevard, Suite 710
Costa Mesa, California 92626
Telephone: (714) 556-1700
Facsimile:  (714) 546-5005

Attorneys for Plaintiff,
SALT OPTICS, INC.

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALT OPTICS, INC., a California Corporation,<br><br>               Plaintiff,<br><br>  vs.<br><br>JAND, INC. d/b/a WARBY PARKER, a Delaware Corporation; THE BEAR CAVE DESIGN, INC., a New York Corporation, and DOES 1 through 10, inclusive.<br><br>               Defendants. | Case No.: SACV10-828DOC (RNBx)<br><br>**PLAINTIFF, SALT OPTICS, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

      TO ALL PARTIES AND THEIR ATTORNEY'S OF RECORD:

      PLAINTIFF, SALT OPTICS, INC. ("Plaintiff" or "SALT") hereby submits the following Memorandum of Points and Authorities in Opposition to Defendants, Jand, Inc. dba Warby Parker ("JAND") and The Bear Cave Design,

Inc.'s ("TBC's") motion to dismiss for failure to state a claim.

Defendants' motion to dismiss for failure to state a claim should be denied on multiple grounds, including the following:

(1)    Salt has stated a claim for trade dress infringement. The Court spoke and Salt listened. Guided by the directives provided by this Court in its November 19, 2010 Order (the "Order"), Salt made extensive refinements to the Second Amended Complaint ("SAC"). Salt incorporated language taken directly from the operative complaint in *Blue Nile, Inc. v. Ice.Com, Inc.,* the leading published descision in the Ninth Circuit on website trade dress, directly into the SAC. Finally, Salt has removed all "disclaimer" language from its trade dress description in the SAC and provided a detailed synthesis of its trade dress elements. It is now absolutely clear where Salt's trade dress lies.

(2)    Notwithstanding these extensive refinements, Defendants continue to improperly dissect Salt's trade dress into its constituent elements in their present Motion. They then invite the Court to analyze each element in isolation to support the conclusions that each element is functional and has not acquired secondary meaning. The law is clear, however, trade dress elements are to be analyzed in combination, not in isolation.

(3)    In addition to refining its trade dress, Salt also extensively refined its copyright allegations. Among other refinements, Salt's copyright infringement claim is now focused upon one (1) copyright registration, the registration covering the Sale Website.

(4)    Salt's trade dress claims are not preempted by the Copyright Act. Salt's website and catalogs contain material protected under *both* the Lanham Act and the Copyright Act. As courts in this circuit have

recently confirmed, the "look and feel" of a website, while not protectable under the Copyright Act, may be protectable as trade dress.

(5)    Salt has a valid copyright in its website, which has been registered with the U.S. Copyright Office. Salt's copyright extends to the "text, photographs, selection, arrangement and compilation" of its website. Defendants summarily claim, however, without any support whatsoever, that the U.S. Copyright Office simply "got it wrong" when it issued Salt's website copyright registration covering all of those elements. Defendants maintain that websites simply are not copyrightable. Defendants are wrong.

(6)    Salt's common law unfair competition and misappropriation claims are also not preempted by the Copyright Act. Each contains the additional elements of deception and misrepresentation and, thus, they are qualitatively different that Salt's copyright infringement claims.

(7)    Assuming *arguendo* that the Court concludes that a claim for trade dress infringement has not been adequately stated, and assuming *arguendo* that the Court will not grant leave to amend, then Salt's copyright infringement claim should be permitted to proceed forward. The present Motion should be denied on those grounds. Similarly, if the Court concludes *arguendo* that the trade dress and unfair competition claims are preempted, then the present Motion should be denied such that Salt can proceed with its copyright infringement claim. Stated differently, there is no basis to dismiss the case in its entirety. Salt has stated at least one viable claim.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

This Opposition shall be based on the accompanying Memorandum of Points and Authorities, the Declaration of Roger N. Behle, Jr., the Request for Judicial Notice, the pleadings, files, and records in this action and any such oral or documentary evidence that might be presented at the hearing on this matter.

DATED: January 10, 2011            **FOLEY BEZEK BEHLE & CURTIS, LLP**

By:      *Roger N. Behle, Jr.*                    .
            Roger N. Behle, Jr., Esq.
            Attorneys for Plaintiff
            Salt Optics, Inc.

# TABLE OF CONTENTS

1. INTRODUCTION ................................................................................ 1

2. ARGUMENT ..................................................................................... 3

    A. Defendants Have Failed to Meet Their Burden Under Rule 12(B)(6); The Motion Should Be Denied ............................................ 3

    B. Salt Has Not Only Met, But Exceeded, the Pleading Requirements for its Trade Dress Infringement Claim........................ 3

        1. Salt Has Removed the "Disclaimer" Language from its Trade Dress Description in the SAC .......................................... 4

        2. Salt Has Clearly and Concisely Synthesized its Trade Dress in the SAC, as Requested by the Court ............................ 4

        3. The SAC Not Only Meets, But Exceeds, the Pleading Standards Set Forth in Rule 8 and Twombly.............................. 9

        4. Salt Has Plead Sufficient Facts to Establish the Distinctiveness of its Trade Dress ............................................ 11

        5. Salt Has Adequately Alleged that its Trade Dress is Non-Functional in the SAC; Defendants Again Urge the Court to Apply The Wrong Test for Evaluating Functionality .......... 13

    C. Salt's Trade Dress Claim is Not Preempted by the Copyright Act ................................................................................................. 17

    D. Salt Has Stated Claims for Common Law Unfair Competition Claim and Common Law Misappropriation; These Claims are Not Preempted by the Copyright Act. ................................................. 22

3. CONCLUSION. ................................................................................. 23

**TABLE OF CONTENTS**

1

## TABLE OF AUTHORITIES

2

## <u>CASES</u>

3

*Allen v. Ghoulish Gallery*, 2007 WL 4207923, *4 (S.D. Cal., Nov. 20,

4
2007) ................................................................................................ 20

5
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). ............. 3, 9

6
*Bibbero Systems, Inc. v. Colwell Systems, Inc.,* 893 F. 2d 1104, 1106

7
(9th Cir. 1990) ................................................................................. 20

8
*Blue Nile, Inc. v. Ice.Com, Inc.,* 478 F. Supp. 2d 1240, (W.D. Wash.

9
2007) .................................................................................. 1, 2, 5, 19

10
*Cal. Pharm Mgt., LLC v. Zenith Ins. Co.,* 2009 U.S. Dist. LEXIS

11
112753 (C.D. Cal. Nov. 5, 2009). ..................................................... 3

12
*Cartier, Inc. v. Four Star Jewelry Creations Inc.*, 2003 U.S. Dist.

13
LEXIS 7844, 13-14 (S.D.N.Y. May 8, 2003) ................................... 10

14
*Computer Mgt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d

15
396 (5th Cir. 2000) ........................................................................... 23

*Conference Archives v. Sound Images, Inc.*, 2010 WL 1626072 (W.D.

16
Pa. 2010) ............................................................................................ 7

17
*Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).................. 9

18
*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d

19
242, 246-47 (9th Cir. 1990). ............................................................ 23

20
*Education Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D.

21
Cal. 1999) .......................................................................................... 20

22
*Eltra Corp. v. Ringer*, 1976 U.S. Dist. LEXIS 12611 (E.D. Va. 1976) ................. 20

23
*Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 346 (5th Cir.

24
1984) ................................................................................................. 16

25
*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842-43

26
(9th Cir. 1987) ............................................................................. 14, 16

27
*Funkhouser v Lowe's Inc.* (1953, CA8 Mo) 208 F2d 185, 99 USPQ

448, cert den (1954) 348 US 843, 99 L Ed 664, 75 S Ct 64, 103 USPQ 424, reh den (1954) 348 US 890, 99 L Ed 700, 75 S Ct 209. ................ 19

*Germain v. J.C. Penney Co.*, 2009 U.S. Dist. LEXIS 60936 (C.D. Cal. July 6, 2009). .................................................................................................. 3

*Haddock v. Board of Dental Examiners of California*, 777 F. 2d 462 (9th Cir. 1985) .......................................................................................... 3

*iroozye v. Earthlink Network*, 153 F. Supp. 2d 1115 (N.D. Cal. 2001) ................. 23

*Kantemirov v. Goldine*, 2005 WL 1593533, *4 (N.D. Cal., June 29, 2005) ................................................................................................................. 21

*Lee v. Mt. Ivy Press, L.P.*, 63 Mass. App. Ct. 538, 827 N.E.2d 727 (2005) ................................................................................................................. 23

*McNeil Nutritionals, LLC v. Heartland Sweetners, LLC*, 511 F. 3d 350, 359-360 ............................................................................................................ 14

*Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F. 3d 114, 122 (2nd Cir. 2001) .................................................................................... 14

*Rutledge v. High Point Reg'l Health Sys.*, 558 F. Supp. 2d 611 (M.D.N.C. 2008) ..................................................................................................... 23

*Samara Bros. v. Wal-Mart Stores,* 165 F.3d 120, 131 (2d Cir. N.Y. 1998) ........................................................................................................... 23

*Sunbeam Products, Inc. v. West Bend Co.*, 123 F. 3d 246, 44 USPQ 2d 1161, 1168 (5th Cir. 1997) ................................................................... 15

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1119 (5th Cir. Tex. 1991) ........................................................................................ 15

*Titan Sports v. Turner Broadcasting Sys.*, 981 F. Supp. 65 (D. Conn. 1997) ................................................................................................................ 23

*Two Pesos v. Taco Cabana*, 505 U.S. 763 (U.S. 1992) ....................................... 12

*United States v. CBS, Inc.,* 459 F. Supp. 832, 834 (C.D. Cal. 1978) ....................... 3

*Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 215 (U.S. 2000)). ............... 12, 13

**TABLE OF AUTHORITIES**

## OTHER AUTHORITIES

http://dictionary.reference.com/browse/include ........................................................ 4

## TREATISES

1-2 Nimmer on Copyright § 2.15 ........................................................................... 20

1-3 Nimmer on Copyright § 3.02 ........................................................................... 21

W. Levin, *Trade Dress Protection*, 2nd Ed., vol. 1, §17:1 (Thomson
    Reuters/West 2009) ............................................................................................ 15

**TABLE OF AUTHORITIES**

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.  Introduction

The present motion to dismiss (the "Motion") presents a singular question for resolution by the Court: Are websites protectable? Although styled as a challenge to the pleadings, the Motion is really an attack on the application of intellectual property law to websites. Defendants quite decidedly believe that websites are <u>not</u> protectable under trade dress, copyright, or any other intellectual property law.[1] However, they cite to authority to support this sweeping proposition and, instead, conveniently ignore published decisions from this circuit where the courts have acknowledged the viability of intellectual property protection for websites.[2]

The tacit premise underlying Defendants' Motion is that websites are in the public domain, freely available to be copied and used by anyone without the consent of the website owner. This comes as no surprise, as this is precisely what Defendants did here. They copied and used sections of the Salt Website without consent. Caught with their hands in the cookie jar, Defendants now know they will lose this case if the Salt Website is found to be protectable. So, they attack the pleadings claiming that Salt has not sufficiently described its trade dress or copyrights. But, in truth, no amount of description or clarification will ever suffice for Defendants; to them, websites are inherently unprotectable.

Indeed, rather than answering the allegations made by Salt, Defendants have repeatedly dodged them by feigning confusion. Their stated excuse was and continues to be that they simply do not understand the nature and scope of the claims being brought by Salt. Without further clarification, Defendants have said they cannot respond; they need "sufficient notice" of the claims. Hearing this, and

---

[1] *See, e.g.,* Motion, fn. 25 ("Conceptually, it is virtually impossible to establish secondary meaning in a website design. . . .For this reason alone, it appears that there are no reported cases wherein a plaintiff has definitely established trade dress in a website") and Motion, p. 22, l. 28 ("a 'website' *itself* is *not* protected by copyright") (emphasis original).

[2] *Blue Nile, Inc. v. Ice.Com, Inc.,* 478 F. Supp. 2d 1240, (W.D. Wash. 2007).

SACV10-828DOC (RNBx)

recognizing that further clarification of the claims may help to advance the case forward, this Court prudently issued an Order[3] granting Salt leave to amend.

In the Order, the Court provided guidance as to how the claims should be refined to provide further clarity. Salt carefully read, considered and incorporated the comments made by the Court in order to fashion an improved amended complaint. But Salt went further. It obtained a copy of the operative complaint in *Blue Nile, Inc. v. Ice.com, Inc.*,[4] the leading case involving website trade dress in the Ninth Circuit, and a case cited by the Court in the Order.[5] Indeed, *Blue Nile* is the only known published decision in the Ninth Circuit establishing pleading guidelines for website-based trade dress and copyright infringement claims. As this Court acknowledged, intellectual property claims involving the overall appearance of a website present novel issues.[6] Given the paucity of authority explicating the precise boundaries of website-based claims, *Blue Nile* is authoritative.[7] Thus, in drafting the Second Amended Complaint ("SAC"), Salt not only incorporated the changes suggested by this Court in the Order, it copied word-for-word the key trade dress allegations from the *Blue Nile* complaint.[8] The claims in the SAC are now finite and fixed. Defendants have a crystal clear target to shoot at in preparing their defense.

In sum, Salt is not clinging to a lifeboat of ambiguity, as Defendants flippantly suggest. Its refined claims are specific and firmly based upon the guidance provided in the Court's Order, as well as language from motion-tested pleadings in published Ninth Circuit case law. As should now be clear, Defendants' game plan is to endlessly claim they do not know what they are being

---

[3] See, e.g., Order of November 19, 2010 (the "Order"), p. 7.
[4] *Blue Nile, Inc. v. Ice.Com, Inc.,* 478 F. Supp. 2d 1240, (W.D. Wash. 2007).
[5] Order, p. 6.
[6] *Id.*
[7] Tellingly, Defendants completely ignore the *Blue Nile* case in the present Motion (and in their preceding motions).
[8] *See p. 2, ll. 3-17, supra*, and ¶33 of the SAC.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

sued for. They will always be able to fashion yet another rhetorical question or claim that an inconsistency exists in the pleadings. On receipt of the SAC, Defendants should have filed an answer. Salt respectfully requests that this Court deny the present Motion and order Defendants to answer.

**2.   <u>Argument</u>**

> **A.   Defendants Have Failed to Meet Their Burden Under Rule 12(B)(6); The Motion Should Be Denied**

The Court's familiarity with the standard for measuring motions to dismiss is assumed; but one aspect of that standard bears reinforcement here: "Courts must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff."[9] Further, motions to dismiss are still granted only in "extraordinary circumstances."[10]

Because a motion to dismiss is raised during the pleading stage, before fact-finding has been conducted through discovery, the granting of such motions is looked upon with disfavor by the courts as a drastic remedy.[11] Indeed, the threshold for surviving a motion to dismiss is extremely low.[12] When considering a motion to dismiss under Rule 12(b)(6), dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.[13]

> **B.   Salt Has Not Only Met, But Exceeded, the Pleading Requirements for its Trade Dress Infringement Claim.**

In its Order, the Court expressed concern (1) that the FAC did not contain an adequate synthesis of elements describing the protectable "look and feel" of the

---

[9] *Cal. Pharm Mgt., LLC v. Zenith Ins. Co.,* 2009 U.S. Dist. LEXIS 112753 (C.D. Cal. Nov. 5, 2009).

[10] *Germain v. J.C. Penney Co.,* 2009 U.S. Dist. LEXIS 60936 (C.D. Cal. July 6, 2009).

[11] *United States v. CBS, Inc.,* 459 F. Supp. 832, 834 (C.D. Cal. 1978) ("pretrial dismissals are highly disfavored, and will only be handed down with extreme prudence and caution").

[12] *Haddock v. Board of Dental Examiners of California*, 777 F. 2d 462 (9th Cir. 1985) (dismissal of complaint improper if its states a claim under any theory).

[13] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).

Salt Website and (2) that the "by way of illustration, not by limitation" language in the FAC left open the possibility that Salt could incorporate other website elements into the trade dress claim at a later stage.[14] This two-fold concern appeared to mirror that expressed by the court in *Sleep Science Partners*[15], wherein the mere cataloging of a website's components, <u>along with</u> language suggesting that the plaintiff intends to "redefine its trade dress at a future stage of the litigation" was held not to give defendants adequate notice.[16] The Court spoke and Salt listened.

### 1.    Salt Has Removed the "Disclaimer" Language from its Trade Dress Description in the SAC

In the SAC, Salt <u>removed</u> all language from its trade dress allegations suggesting that the listed elements are only some potential of the trade dress elements.[17] Having removed this language, the trade dress allegations in the SAC are now finite and fixed. Defendant' suggestion that the word "includes" is somehow "deliberately vague" is yet another desperate attempt to create ambiguity where none exists.[18] To the contrary, the word "includes" actually means "to contain."[19] This is precisely what the Court said it wanted and Salt has complied. Defendants are now grasping at straws.

### 2.    Salt Has Clearly and Concisely Synthesized its Trade Dress in the SAC, as Requested by the Court

As this Court accurately noted, "[i]ntellectual property claims surrounding the overall appearance of a website present relatively novel issues."[20] The Court went on to note that "the Ninth Circuit has yet to explicate the precise boundaries of trade dress law applied to the internet."[21] There is, however, a developing body

---

[14] Order, pp. 6-7.
[15] *Sleep Science Partners v. Avery Lieberman*, 2010 U.S. Dist. LEXIS 45385, *7 (May 10, 2010).
[16] Order, p. 7.
[17] FAC, ¶31 was removed from the SAC.
[18] Motion, p. 2, l. 24.
[19] See, http://dictionary.reference.com/browse/include ("to contain, as a whole does parts or any element").
[20] Order, p. 6.
[21] Id.

of authority establishing the general parameters for trade dress claims involving the "look and feel" of a website. The leading published opinion on the subject in the Ninth Circuit is *Blue Nile, Inc. v. Ice.Com, Inc.*[22]

Like the Defendants here, the defendants in *Blue Nile* brought a motion to dismiss under F.R.C.P. 12(b)(6), claiming that plaintiff had not sufficiently described its trade dress in the complaint: "The Court will search in vain for this ['look and feel'] allegation in the complaint."[23]   The *Blue Nile* court, however, disagreed, finding that "plaintiff's allegations in paragraph 52 of its amended complaint relating to the 'design and presentation of diamond search features' [were] *sufficient* to support a claim that plaintiff is seeking to protect the 'look and feel' of its website."[24]

In this novel area of the law, the *Blue Nile* court provided guidance as to the level of specificity required for a plaintiff to sufficiently plead a trade dress for the "look and feel" of a website. Citing to *Blue Nile* in its Order, this Court urged Salt to "refine its trade dress in any amended complaint."[25] Accordingly, Salt took great care to refine its trade dress description in the SAC to comport with the allegations approved by the court in *Blue Nile*. The steps taken by Salt to comply with the Court's Order were as follows:

As noted above, the *Blue Nile* court determined that the allegations in paragraph 52 of the amended complaint were *sufficient* to support a trade dress claim based on the "look and feel" of a website.[26] Paragraph 52 of that complaint reads as follows:

> The similarities between the design and presentation of diamond search features of the Defendants' www.diamond.com website published in interstate commerce and Blue Nile's

---

[22] *Blue Nile, Inc. v. Ice.Com, Inc.,* 478 F. Supp. 2d 1240, (W.D. Wash. 2007).
[23] *Id.* at 1244
[24] *Id.*
[25] Order, p. 6.
[26] *Blue Nile, Inc.,* 478 F. Supp. 2d at 1244.

> distinctive diamond search features associated with its quality, reliability, reputation and goodwill is likely to cause consumer confusion or to cause mistake or to deceive as to Diamond.com affiliation, connection, or association with and/or endorsement or approval by the same source as the Blue Nile diamond search page.[27]

Following this guide, Salt added paragraph 33 to the SAC, which incorporated word-for-word the key trade description language from paragraph 52 of the *Blue Nile* complaint. Thus, with the key language from *Blue Nile* underlined, paragraph 33 of the SAC reads as follows:

> The similarities between the (1) use of color, (2) visual and interface design of its eyewear collections and selection webpages, and (3) logo placement on the Warby Parker website which is published in interstate commerce and Salt's distinctive (1) use of color, (2) visual and interface design of its eyewear collections and selection webpages, and (3) logo placement which are associated with Salt quality, reliability, reputation and goodwill is likely to cause consumer confusion or to cause mistake or to deceive as to the affiliation, connection, or association with/and/or endorsement or approval by the same course as the Salt Website.

Thus, the single paragraph found by the court in *Blue Nile* to contain the necessary "look and feel" language (¶52) has now been incorporated into the SAC, at ¶33.

Salt, however, acknowledges that this was only the first step. A synthesis of elements was also to be included in the SAC. To this end, Salt remained mindful of the second facet of the Court's two-fold concern stated at pages 6 and 7 of the Order (the first facet being the "disclaimer" language and the second facet being the "mere cataloging" of a website's features). Having removed the disclaimer language, Salt then took great care to synthesize the combination of trade dress

---

[27] Request for Judicial Notice, First Amended Complaint, *Blue Nile v. Ice.Com, Inc.*, ¶52.

elements comprising the "look and feel" of its website.[28]

Paragraph 22 of the SAC makes clear that Salt is claiming trade dress comprising the "look and feel" of its website ("[t]he Salt Website incorporates a trade dress comprising a distinctive 'look and feel' of elements. . . .[and] includes the placement of photographs, colors, borders, frames, interactive elements and overall mood, style and impression.").[29]  Had Salt stopped there, one could argue that Salt had done nothing more than catalogue the features of its website. But Salt went much further.

Having identified these features, Salt then carried out the task of showing how they interrelated with one another, in combination, to create the "look and feel" of the Salt Website. Salt accomplished this through a combination of written explanation and graphic images, inserted directly into ¶23 of the SAC.[30] This is the synthesis that the Court had requested, and what distinguishes this case from *Sleep Science Partners*[31] and *Conference Archives v. Sound Images, Inc.*[32]

Defendants can no longer feign confusion. Paragraph 23 of the SAC states in crystal clear, unequivocal terms that "the 'look and feel' of the Salt Website is comprised of three elements in combination. . . ." Those three elements are explained and depicted graphically in Paragraph 23, which spans nearly five (5) pages of the SAC.  If the written explanations were not enough to convey the "look and feel" of the Salt Website, then certainly actual pictures of the relevant website pages accomplished this task. A picture is worth a thousand words:

---

[28]  In doing so, Salt made clear that its trade dress was "separate and distinct" from the copyrightable aspects of its website, SAC ¶10.

[29] SAC, ¶22.

[30] To show the level of detailed analysis and synthesis contained in Paragraph 23, Salt originally intended to reprint that paragraph in its entirety here. However, in that Paragraph 23 spans nearly five (5) pages, Salt has "discretely" elected to incorporate the same here by reference only.

[31] *Sleep Science Partners v. Avery Lieberman*, 2010 U.S. Dist. LEXIS 45385, *7 (May 10, 2010).

[32] *Conference Archives v. Sound Images, Inc.*, 2010 WL 1626072 (W.D. Pa. 2010).



*Salt Optics Website.*



*Warby Parker Website.*

Finally, Defendants suggestion that websites are ever-changing and, therefore, Salt cannot maintain a trade dress claim is easily refuted. The "look and feel" of the Salt Website, as well as its attendant role in identifying Salt as the source of the products featured on the website, can continue in perpetuity even after changes are made. For instance, Defendants falsely imply that Salt's inclusion of new products on its website destroys trade dress protection.[33] This is nonsense. If one were to accept this premise, then the restaurant chain made famous by the

---

[33] Motion, p. 13, fn. 26.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

U.S. Supreme Court in its *Two Pesos* decision would have lost all trade dress protection (for the décor, paintings, murals and themes of its restaurants) upon making changes to its menu. Trade dress can be maintained in perpetuity, whether they take the form of restaurant décor or the "look and feel" of website, even where "menu" choices have been changed. But, to put to rest any temptation Defendants may have to again complain that they are unsure which "trade dress" they are accused of infringing, <u>Salt is only alleging that Defendants have infringed the trade dress described in the SAC</u>. That is it; Salt is not seeking to enforce "other iterations" of its website.[34] Now that this trade dress has been described in abundant detail in the SAC, Defendants have been provided sufficient notice as to the claims they are required to defend.

3.   <u>The SAC Not Only Meets, But Exceeds, the Pleading Standards Set Forth in Rule 8 and Twombly.</u>

In the present Motion, Defendants continue to argue that Salt's trade dress infringement claim must fail because it is still <u>not</u> pled with the specificity necessary to satisfy *Twombly*.[35]   Given the substantial refinements made in the SAC, the level of specificity Defendants still try to extract from Salt at the pleading stage well exceeds what is required under *Twombly*.[36] As noted in *Twombly*, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'."[37] Here, Salt has not only met, but exceeded these requirements. Indeed, as required by Rule 8, the SAC contains an abundance of "written statements" showing Salt is entitled to relief. Salt describes in detail the elements that *in*

---

[34] Motion, p. 11, l. 3.
[35] *Id.*
[36] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).
[37] *Bell Atl. Corp.*, 550 U.S. at 555; *citing, Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

*combination* comprise its website trade dress.[38] Elsewhere in the SAC, Salt painstakingly describes how these elements interrelate with one another to create the total visual experience viewers see when entering the website.[39] These written descriptions more than adequately give Defendants "fair notice' of the trade dress they are alleged to have infringed.

Further, from a purely procedural standpoint, it is important to remember that this case is still at the pleading stage. The parties' Rule 26 disclosures have not been exchanged; no written discovery has been conducted; and no depositions have been taken. And yet, even at this early stage, Defendants demand more than is required. The rules of pleading do not require this level of detail. By any objective measure, the SAC provides Defendants with an abundant written description of Salt's trade dress such that they have "fair notice" of the claim.

In addition, as noted above, Salt has also given Defendants actual "pictures" of the described website trade dress, by embedding images directly into body of the SAC[40] and by attaching a full set of website "screen captures" to the FAC as an exhibit.[41] Thus, while Rule 8 requires only "short plain *statements,*" Salt has provided Defendants with actual pictures of its website and the combined elements comprising its trade dress. These images correspond with the written statements describing them. In addition to reading about them, Defendants can now *see* the described trade dress for themselves.[42]

As the foregoing analysis reveals, Defendants reliance upon *Sleep Science Partners v. Avery Lieberman*[43] is misplaced. *First*, unlike Salt, the plaintiff in *Sleep Science* did not allege that its trade dress was comprised of elements to be "taken

---

[38] *See, e.g.*, SAC, ¶¶22, 23 and 33.
[39] SAC, ¶23.
[40] Practical limitations precluded Salt from embedding each and every page from its website directly into the body of the SAC.
[41] SAC, Ex. A.
[42] *See, Cartier, Inc. v. Four Star Jewelry Creations Inc.*, 2003 U.S. Dist. LEXIS 7844, 13-14 (S.D.N.Y. May 8, 2003).
[43] *Sleep Science Partners v. Avery Lieberman*, 2010 U.S. Dist. LEXIS 45385, *7 (May 10, 2010).

SACV10-828DOC (RNBx)

in *combination*."[44] Only individual "features" of its website were described.[45] *Second*, the plaintiff did not allege how these elements "interacted" with one another to create a "particular visual impression."[46] Here, Salt went to great lengths in the SAC (¶23) to describe the interrelation of trade dress elements on its website. *Third*, and most significantly, the plaintiff in *Sleep Science* did not include "pictures" of the alleged trade dress in its complaint. In contrast, Salt's SAC includes an abundance of visual depictions of its website, which correlate with the written descriptions of the composite trade dress elements contained in the body of the SAC. In sum, the plaintiff in *Sleep Science* (intentionally or otherwise) described its trade dress component-by-component. As a result, that court expressly limited its analysis to whether the plaintiff had plead sufficient facts "to support trade dress protection for *each individual component*." Here, Salt has made clear that it is the *combination of elements* that constitutes its trade dress. Defendants have been given more than "fair notice."

4.   Salt Has Plead Sufficient Facts to Establish the Distinctiveness of its Trade Dress

Defendants also inaccurately describe what they refer to as the "true test" for distinctiveness in a website trade dress infringement case.[47] Defendants assert in the Motion, without any authority whatsoever, that "Website Trade Dress is not inherently distinctive. . . ."[48] Once again, Defendants "jump over" a subtle, yet critical, distinction in the law of trade dress – namely, that secondary meaning need not be alleged (or proven) in a trade dress claim involving the "total image and appearance" of a business, such as the present case. Defendants *presume* the opposite.

---

[44] *Id.* at *8 (emphasis added).

[45] *Id.* Plaintiff alleged that is website features included "(1) the ability to view SSP's television commercial; (2) user testimonials; (3) the screening questionnaire; and (4) the Pure Sleep Method."

[46] *Id.*

[47] Motion, p. 10.

[48] Motion, p. 11, l. 4.

In its landmark decision, *Two Pesos v. Taco Cabana*,[49] the U.S. Supreme Court held that the trade dress of a business – that is, the total image and appearance of a business – may be protected under Section 43(a) of the Trademark Act of 1946 ("Lanham Act") (15 USC §1125(a)), *without proof that the trade dress has a secondary meaning*.[50] The trade dress at issue in the *Two Pesos* case involved the image and appearance of a restaurant business, including the décor, motifs, "bright colors, paintings and murals" used throughout the restaurants. As to such trade dress, the Court held that secondary meaning was not required. The Court noted: "[A]dding a secondary meaning requirement could have anticompetitive effects, creating particular burdens on the startup of small companies."[51]

Notably, *Two Pesos* (like the instant case) is a "total image and appearance"[52] case; it did not involve *product-design* trade dress. Indeed, there is a critical distinction between product-design trade dress cases and total image and appearance cases. In the former, secondary meaning is a required element, whereas in the latter, it is not.

That distinction was brought to bear in the U.S. Supreme Court's decision in *Walmart Stores v. Samara Bros.*[53] In *Walmart*, the Court held that "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a *product's design* is distinctive, and therefore protectible, only upon a showing of secondary meaning."[54] Reconciling its holding in *Two Pesos*, the Court stated:

---

[49] *Two Pesos v. Taco Cabana*, 505 U.S. 763 (U.S. 1992).

[50] "[P]roof of secondary meaning is not required to prevail on a claim under § 43(a) of the Lanham Act where the trade dress at issue is inherently distinctive." *Two Pesos,* 505 U.S. at 776; Moreover, the Court noted that "[a] particular trade dress. . .is now considered as fully capable as a particular trademark of serving as a 'representation or designation' of source under § 43(a)." *Id.* at 787.

[51] *Two Pesos*, 505 U.S. at 775.

[52] *See, Id.* at 764, fn. 1. The U.S. Supreme Court later characterized such trade dress as "*tertium quid*," to distinguish it from product-design trade dress. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 215 (U.S. 2000)).

[53] *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205 (U.S. 2000) .

[54] *Wal-Mart Stores*, 529 U.S. at 216 (emphasis added).

*Two Pesos* is inapposite to our holding here because the trade dress at issue, the decor of a restaurant, seems to us *not to constitute product design*. It was either product packaging -- which, as we have discussed, normally is taken by the consumer to indicate origin -- or else some *tertium quid* that is akin to product packaging and has no bearing on the present case.[55]

The same can be said of this case; it is <u>not</u> a product-design trade dress case. Rather, it is the total image and appearance of Salt's business, as expressed on its website, that constitutes protectable trade dress. More specifically, the "look and feel" of the Salt Website are the virtual-world equivalents of the décor, motifs, "bright colors, paintings and murals" found to be protectable trade dress by the United States Supreme Court in *Two Pesos*. In each case, the effect on the consumer is the same – to identify the *source* of the goods or services being offered. The reasoning supporting trade dress protection for brick-and-mortar retail establishments, like restaurants, applies equally to virtual-world retail establishments, like websites. The consumer has the same sensory perceptions, albeit in different media. In the SAC, Salt has pleaded sufficient facts at ¶¶ 11, 13, 14, 15, and 22 to establish distinctiveness.

     5.   <u>Salt Has Adequately Alleged that its Trade Dress is Non-Functional in the SAC; Defendants Again Urge the Court to Apply The Wrong Test for Evaluating Functionality</u>

Defendants maintain their argument that Salt has not alleged that its trade dress is non-functional. The flaw in this argument, as before, is that it is (1) fact-intensive, not proper for determination on a motion to dismiss and (2) based upon the improper dissection and segregation of Salt's individual trade dress elements, which are each analyzed in isolation, rather than in combination.

To prevail on its trade dress claim, Salt is not required to allege or prove that Defendants "copied" particular elements from its website. Rather, Salt is only

---

[55] *Wal-Mart Stores*, 529 U.S. at 215 (emphasis added).

required to allege and prove that the "combination of visual elements" taken together is likely to cause confusion."[56] As another court admonished, "we have repeatedly held that the appropriate test for similarity of trade dress is *overall impression* of the products and the *entirety of the trade dress*. . . ."[57] Defendants perpetuate the error by urging the Court to "remove" the functional elements from Salt's trade dress.[58] This is *not* proper.[59] Rather, the Court should focus on the "overall impression" created by the trade dress.

Compounding the first flaw in Defendants' argument is their *presumption* that the only feature from the Salt Website that "could possibly constitute Trade Dress, is 'Saltwater Blue' color."[60] This presumption is unsupported by reference to any authority, case law or statute. Moreover, as set forth above, Salt does not claim trade dress protection for any single element, but rather the entire "look and feel" of the Salt Website. But even as to this single element, Defendants suggest that the Saltwater Blue color is "invisible" on all pages of the Salt Website. This is clearly not true. Even in the screen capture from the Salt Website, printed above, the word "Optics" is clearly shown in Saltwater Blue. Similarly, the color Saltwater Blue appears boldly (and without authorization) on the corresponding screen capture from Defendants' Warby Parker Website, also printed above, with the printed the words "Men," "$95" and "Free Shipping Home Try-Ons & Returns."

As to Defendants' attempts to analyze the elements in isolation, courts and scholarly writers alike have identified the fallacy of this approach, despite its facial appeal:

The correct test, however, is *not whether the individual*

---

[56] *See, e.g., Fuddruckers, Inc.,* 826 F.2d at 842-43 (9th Cir. 1987) ).

[57] *Nora Beverages, Inc. v. Perrier Group,* 269 F. 3d 114, 122 (2nd Cir. 2001) (emphasis added).

[58] Motion, p. 16, ll. 19-25.

[59] *McNeil Nutritionals, LLC v. Heartland Sweeters, LLC*, 511 F. 3d 350, 359-360 ("[I]t is legal error to engage in a 'detailed analysis of the differences in the marks rather than focusing on the overall impression created by them. . .' ."

[60] Motion, p. 5.

> *elements are functional*, but whether the *overall combination of elements, taken as a whole, is functional*. If this were not the test, then virtually all trade dress would be defined as functional.[61]

Nevertheless, Defendants try to lead the Court down the analytic path of assessing the functionality of *each* trade dress element in the SAC. Defendants' argument reduces to a fallacious syllogism: (1) functional elements do not enjoy protection; (2) Salt's trade dress includes functional elements; (3) therefore Salt's trade dress does not enjoy protection. What Defendants patently ignore, however, is that "a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection."[62] Notably, the Motion is bereft of *any* analysis of the trade dress elements in combination. This is telling. As forewarned by the courts, analyzing the functionality of individual elements in isolation will lead to absurd results – virtually assuring that all trade dress will be defined as functional.

Defendants also mislead the Court by claiming that all of Salt's trade dress must appear on the website "homepage" in order to be protectable.[63] Again, Defendants provide no authority for this proposition. To make their point, however, Defendants improperly attempt to analogize magazine covers to websites. They claim that a magazine cover is just a like a website homepage. It is not. While a magazine cover might be the first thing a consumer sees on the newsstand before making a purchasing decision, websites homepages are not. That is, websites are not always accessed by the consuming public "through" the homepage.

Most consumers use one of several popular search engines (such as Google®

---

[61] W. Levin, *Trade Dress Protection*, 2nd Ed., vol. 1, §17:1, pp. 17-1 - 17-2 (Thomson Reuters/West 2009); *citing, Sunbeam Products, Inc. v. West Bend Co.*, 123 F. 3d 246, 44 USPQ 2d 1161, 1168 (5th Cir. 1997) ("To the contrary, we have characterized this argument as a 'fallacious syllogism,' belied by the principle that an arbitrary combination of functional features may be non-functional.")

[62] *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. Tex. 1991).

[63] Motion, pp. 6-7.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

or Yahoo®) to find what they are looking for. They type their search terms into the search engine and the engine provides corresponding results.  The results provided, however, may take the consumer to a page deep within the company website, rather than to the company homepage. For instance, a consumer looking to buy boy's clothing at a nationwide retailer (such as Target®) might type the words "Boys Clothing Target" into a search engine like Google. That actual search, as conducted on Google, lists the following website page as the top search result: http://www.target.com/Boys-Clothing-Kids/b?ie=UTF8&node=13142121.    This website page, however, is not the Target® homepage. It is a page deep within the Target® website that features boy's clothing. So, in light of this search result, does it now follow that any trade dress protection Target® has in its website has been lost? The obvious answer is no.

Similarly weak is Defendants' argument that Salt's "Presentation" and "Selection Process" of its website are functional. Again, Defendants break down each feature component in isolation and then argue that such features appear on other websites. But, Salt has never made such sweeping assertions. Applying this reasoning, *any* trade dress involving any one of these website features would necessarily be functional. Defendants have (by design) substituted a superficially similar yet not equivalent proposition to the one *actually alleged* by Salt, so that it may be more easily refuted. At no time has Salt ever claimed that it owns the exclusive right – by trade dress or otherwise – to use a "scroll bar" in isolation.[64] To be sure, other companies have the right to use "scroll bars" or "model names" or other individual elements of Salt's trade dress. But, Salt "can protect a combination of visual elements 'that, taken together, . . .may create a distinctive visual impression'."[65] Likewise, Defendant JAND may enter the eyewear market, but it may not copy Salt's distinctive combination of elements on its website.

---

[64] Motion, p. 8.

[65] *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842-43 (9th Cir. 1987). *quoting Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 346 (5th Cir. 1984).

Defendants' imitation reflects not merely the individual elements of Salt's trade dress, but its distinctive combination of elements.

Lastly, the placement of the Salt logo in the upper left portion of the Salt Website is not, *ipso facto*, functional. There are many places a logo can be placed. Take the famous Google® website, for instance, where its logo appears in the middle of the webpage (www.google.com). Other companies choose to place their logos in different locations. So, contrary to Defendants' claim, it is not "industry standard" for logos to be placed in the upper left portion of a website.[66] Because logos can be placed almost anywhere on a website to "function," placement on the upper left of a webpage does not render a logo functional. Beyond this, Salt is not claiming that it owns the exclusive right to place its logo in the upper left portion of its website. Rather, the placement of the logo in this location – taken together with all the other trade dress elements described in the SAC – is what comprises the "look and feel" of the Salt Website.

### C.    Salt's Trade Dress Claim is Not Preempted by the Copyright Act

Equally unfounded is Defendants' continuing assertion that Salt's trade dress claim is preempted by the Copyright Act. Again using this Court's Order as a guide, Salt has refined its copyright infringement claim to more clearly "identify which portions of the website. . .it accuses Defendants of infringing."[67] For starters, Salt has limited its copyright infringement claim to a single copyright registration, the registration for the Salt Website.[68] So, notwithstanding Defendants' attempts to create confusion through semantics,[69] there is but a single registered copyright at issue in this case. In addition, Salt has refined the "Factual Allegations" section of the SAC to clearly and concisely identify "The Salt

---

[66] Motion, p. 9.
[67] Order, p. 7.
[68] SAC, ¶16.
[69] Defendants claim to be confused by the plural use of the word "copyright" in the SAC, even though ¶16 makes it clear that <u>only one copyright registration</u> is at issue in this case. Defendants know this and are once again attempting to create confusion where none exists.

Website Copyright"[70] so that it can be distinguished from "The Salt Website Trade Dress."[71]

In addition, the Court asked Salt to clarify which portions of the Salt Website it is accusing Defendants of infringing. Therefore, Salt added new paragraphs 44 through 47 to SAC to more clearly and concisely define which portions of the Salt Website were infringed by Defendants. These additional allegations can be summarized, in pertinent part, as follows:

> (a) Salt has a registered copyright in the Salt Website;
> (b) The Salt Website copyright includes compilations of text and photographs;
> (c) The Salt Website includes the arrangement, display of the named glasses on one side of the collection webpage, juxtaposed with a photograph of the glasses being worn by a model on the other at Level One, together with the Level Two webpage, bearing a close up photograph of the glasses featured at a distinct angle above multiple smaller images of the eyewear displaying color choices along with two distinct views of the glasses being worn by a model;
> (d) The Defendants presentation of its compilations of text and photographs, arrangement, display of the named glasses on one side of the collection webpage, juxtaposed with a photograph of the glasses being worn by a model on the other side, which also bears a close up photograph of the glasses featured at a distinct angle above multiple smaller images of the eyewear displaying color choices along with two distinct views of the glasses being worn by a model is substantially similar to original protected elements of Salt Optics copyrighted "Salt Optics 3.6" webpages.

Copyright claims and trade dress claims are often brought in the same action because the subject matter sought to be protected may fall within both of these legal areas. Courts have also found the subject matter of websites to be eligible for protection under both trade dress and copyright laws. Indeed, the very same

---

[70] SAC, ¶16.
[71] SAC, ¶¶17-23.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

preemption argument made by the Defendants in the present case was considered and <u>rejected</u> in *Blue Nile, Inc. v. Ice.Com, Inc.*[72]   In that case, the plaintiff sought protection for its website under both the Lanham Act and the Copyright Act. Like Defendants in this case, the defendant in *Blue Nile* sought to have plaintiff's trade dress claim dismissed under Rule 12(b)(6), asserting that it overlapped with plaintiff's copyright claims. However, the court refused to dismiss the trade dress claims, finding a lack of authority to support a Rule 12(b)(6) dismissal of a Lanham Act claim based on the availability of an adequate remedy under copyright.[73]  The nature of the inquiry was fact-intensive and required full development. Of particular significance to the present case, however, was the court's confirmation that the "look and feel" of a website, while not protectable under the Copyright Act,[74] may be protectable as trade dress.[75]

In the present case, Salt is not attempting to protect the same "text" and "photographs" under duplicative legal theories (trade dress and copyright), as Defendants suggest.[76] For starters, Salt has focused its copyright infringement claims upon a single registration, the registration covering the Salt Website only. "Clearly, not all "text" is protectable by copyright. For instance, the names of Salt's frame styles – while clearly "text" – fall outside the scope of the Copyright Act.[77] However, those same names, when combined with other distinctive elements from the website, become an integral part of Salt's overall trade dress. Indeed, even the *types* of names Salt has selected for its frame styles (e.g., first names/surnames) contribute to the "total appearance and image" of its business.

Other text from Salt's Website is protectable under the Copyright Act as a

---

[72] *Blue Nile, Inc. v. Ice.Com, Inc.,* 478 F. Supp. 2d 1240, (W.D. Wash. 2007).

[73] *Id.* at 1244.

[74] *Id.* at 1244, fn. 4.

[75] *Id.* at 1246, fn. 8 ("there are more articles supporting trade dress protection for the 'look and feel' of websites than there are published cases deciding the merits of this theory.")

[76] Motion, p. 13.

[77] Right to use of certain words or names is not protected by copyright. *Funkhouser v Lowe's Inc.* (1953, CA8 Mo) 208 F2d 185, 99 USPQ 448.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

"literary work," irrespective of whether it is combined with other material.[78] It is the *content and context* (i.e., original expression) of this text that qualifies it for protection under the Copyright Act.[79] Further, while the particular fonts Salt has selected for the "text" on its website may not be protectable by copyright,[80] those same fonts are valuable constituent elements of Salt's overall trade dress.[81] The point is that the very same "text" can be protected under both trade dress and copyright law. Each protects something different.

In the instant case, Salt applied for and received a copyright registration covering the "*text, photograph(s), selection, arrangement and compilation* of the Salt Website."[82] A copyright registration certificate provides *prima facie* evidence of the validity of the copyright, such that the holder of the registration certificate need not put on evidence of the ownership or originality in the copyrighted work.[83] The burden is then on the defendant to overcome the presumption of validity.[84] Defendants have not and cannot overcome this presumption.

In a recent case out of the Southern District of California, *Allen v. Ghoulish Gallery*, the court held that the plaintiff was "entitled to copyright protection in the *selection, arrangement and presentation of the contents of his website.*"[85]

---

[78] 17 U.S.C. §102(a)(1).

[79] "Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia. . . .17 USC § 101.

[80] However, this appears to be an open question in light of "the House Committee's statement that it "has considered, but chosen to *defer*, the possibility of protecting the design of typefaces. . . .1-2 Nimmer on Copyright § 2.15; *but see, Eltra Corp. v. Ringer*, 1976 U.S. Dist. LEXIS 12611 (E.D. Va. 1976) (denying copyright protection and registration of typeface designs).

[81] Font style, size, or color of words, letters, or numbers may be claimed as an element of trade dress or trademark applications (37 C.F.R. §2.52(a)).

[82] See, Declaration of Roger N. Behle, Jr. ("Behle Decl."), ¶ 5. Notably, the copyright registration for the Salt Website was submitted on a "special handling" basis. Thus, the application was reviewed by a staff examiner at the U.S. Copyright Office upon receipt. After discussion with counsel for Salt, the staff examiner recommended and approved the description for the Salt Website, namely the "text, photographs, selection, arrangement and compilation" of the website.

[83] See, 17 U.S.C. §410(c); *Education Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999).

[84] *Bibbero Systems, Inc. v. Colwell Systems, Inc.,* 893 F. 2d 1104, 1106 (9th Cir. 1990).

[85] *Allen v. Ghoulish Gallery*, 2007 WL 4207923, *4 (S.D. Cal., Nov. 20, 2007).

Similarly, in *Kantemirov v. Goldine*,[86] decided in the Northern District of California, the court held: "Given the flexible definition of works falling within the scope of the Copyright Act, the court concludes that *the website design and layout in question falls within the general subject matter of the Copyright Act*."

The Copyright Act, itself, provides further support for the conclusion that Salt's website copyright comprises more than just "text" and "photographs," as suggested by the Defendants. In addition to text and photographs, Salt's copyright registration also covers the "*selection, arrangement and compilation* of the Salt Website."[87] "Compilations" are among the copyrightable subject matter set forth in the Copyright Act.[88] Thus, the scope of Salt's website copyright is limited to the selection, arrangement and compilation of the elements contained on the website.

This reveals the flaw in Defendant's next argument, namely, that Salt's copyright infringement claim must be dismissed because of alleged "changes" to Salt's website.[89] *First*, there is nothing in the SAC suggesting that there have been any changes to the copyrightable subject matter on the Salt's website. Nor have Defendants presented any such evidence. Recall that Salt's copyright includes the selection, arrangement and compilation of various elements on the website. So, even though a particular element[90] may change, the arrangement and compilation structure of all elements relative to one another remains the same. *Second*, even if there were changes to the copyrightable subject matter, Defendants do not escape liability because of those changes. Assume, for the sake of illustration, that Defendants were found to have infringed version "A" of the Salt website for a

---

[86] *Kantemirov v. Goldine*, 2005 WL 1593533, *4 (N.D. Cal., June 29, 2005)
[87] SAC, Ex. B (emphasis added).
[88] "Section 103(a) of the Copyright Act, in addition to recognizing copyright in derivative works, also provides that the subject matter of copyright as specified in Section 102 includes compilations. A compilation is defined as: a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 1-3 Nimmer on Copyright § 3.02.
[89] Motion, p. 23.
[90] This includes elements that, standing alone, would not be independently copyrightable.

period of one year. That Salt later changed its website (to version "B") does not relieve Defendants of liability for having infringed version "A" for the preceding year.  Here, Defendants have failed to show that they have not infringed the Salt website or catalogs – in *any* version.

"In a statutory infringement action, it is no longer necessary that either a copy of the work allegedly infringed, or a copy of the allegedly infringing work, accompany the complaint."[91] Thus, Defendants' request that the Court render a factual finding of "non-substantial similarity" before the Court has had the opportunity to see all the copyrighted works at issue is in an invitation for error. Moreover, even a cursory review of the representative samples of Defendants' website and Salt's website embedded into the SAC reveals them to be substantially, if not strikingly, similar.

Lastly, Defendants argue that Salt has failed to state claims for vicarious copyright infringement or contributory copyright infringement.[92] In considering this argument, however, one must query whether Defendants have even read the SAC.

### D. Salt Has Stated Claims for Common Law Unfair Competition Claim and Common Law Misappropriation; These Claims are Not Preempted by the Copyright Act.

Lastly, Defendants argue that Salt has failed to state claims for common law unfair competition and common law misappropriation. As with their other arguments, however, this argument is similarly based on a false premise, namely, that Salt's common law claims are really copyright claims. This premise is based upon a selective reading of the fifth and seventh causes of action. Notably, Defendants neglect to point out that the unfair competition cause of action includes allegations of deception and misrepresentation.[93] So too does Salt's common law

---

[91] 1-12 Nimmer on Copyright § 12.09.
[92] Motion, pp. 16, fn 30.
[93] SAC ¶¶ 68-73.

misappropriation cause of action.[94] Copyright infringement claims, in contrast, do not require such allegations. Indeed, crucial to liability under an unfair competition cause of action or misappropriation cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement.[95] Thus, because they are qualitatively different from a copyright infringement claim, Salt's common law unfair competition claim and misappropriation claim are not preempted.

### 3.   <u>Conclusion.</u>

For the foregoing reasons, Salt respectfully requests that this Court DENY Defendants' Motion in its entirety. The most cursory review of Salt's SAC reveals that it more than adequately sets forth claims against Defendants.   Should this Court disagree, Salt requests that it be granted a further leave to amend.[96] However, assuming *arguendo* that the Court concludes that a claim for trade dress infringement has not been adequately stated, and assuming *arguendo* that the Court will not grant leave to amend, then Salt respectfully requests that its copyright infringement claim be permitted to proceed forward. Similarly, if the Court concludes *arguendo* that the trade dress and unfair competition claims are preempted, then the present Motion should be denied such that Salt can proceed with its copyright infringement claim.

DATED:  January 10, 2011    **FOLEY BEZEK BEHLE & CURTIS, LLP**

By:    <u>Roger N. Behle, Jr.                        </u>.
       Roger N. Behle, Jr., Esq.
       Attorneys for Plaintiff

---

[94] SAC ¶75.

[95] *See, e.g., Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 404 (5th Cir. 2000); *Rutledge v. High Point Reg'l Health Sys.*, 558 F. Supp. 2d 611, 620 (M.D.N.C. 2008); *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1128 (N.D. Cal. 2001); *Titan Sports v. Turner Broadcasting Sys.*, 981 F. Supp. 65, 71 (D. Conn. 1997); *Lee v. Mt. Ivy Press, L.P.*, 63 Mass. App. Ct. 538, 827 N.E.2d 727, 738 (2005); *Samara Bros. v. Wal-Mart Stores,* 165 F.3d 120 (2d Cir. N.Y. 1998), *rev'd on other grounds*, 529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000).

[96] *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection*, 911 F.2d 242, 246-47 (9th Cir. 1990).

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically on January 10, 2011 in compliance with Civ. L.R. 5.4. As such, this document was served on all filing users. See Civ. L.R. 5.4(c).

_Roger N. Behle, Jr._              .
Roger N. Behle, Jr.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

**PROOF OF SERVICE**

**STATE OF CALIFORNIA**    )
                           ) ss

**COUNTY OF ORANGE**      )

     I, the undersigned, declare that I am, and was at the time of service of the papers herein referred to, over the age of 18 years and not a party to the within action or proceeding.  My business address is 575 Anton Boulevard, Costa Mesa, California, 92626.

     On January 10, 2011, I served the following document(s):

**PLAINTIFF, SALT OPTICS, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

on the following person(s), with the name and address of the person served shown on the envelope as follows:

Harry P. Weitzel
PEPPER HAMILTON LLP
4 Park Plaza, Ste 1200
Irvine, California 92614

M. Kelly Tillery, Esq.1
Christopher D. Olszyk, Jr., Esq.*
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

☐    <u>BY FACSIMILE</u>: I caused the above-referenced document(s) to be served on the person(s) listed above by facsimile and from Foley & Bezek, LLP's facsimile machine no. (805) 962-0722.

☐    <u>BY E-MAIL</u>: I submitted an electronic version of the above-referenced document(s) to the person(s) whose e-mail address(es) is/are known to me as listed above.

x    <u>BY MAIL</u>: I am familiar with the practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  The above-referenced document(s) will placed in an envelope, addressed to the person(s) listed above, sealed, and deposited with the United States Postal Service with postage fully prepaid in accordance with the ordinary course of business.

     I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.  Executed on January 10, 2011, at Costa Mesa, California.

Jenna Loeser